**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOY FOOD STORES, INC., d/b/a Ken's IGA, Respondent.**

No. 82–1169.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 29, 1982.

Decided Jan. 14, 1983.

Lynne Deitch, Assoc. Gen. Counsel, N.L.R.B., Washington, D.C., for petitioner.

Larry G. Hall, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for respondent.

Before CUMMINGS, Chief Judge, POSNER, Circuit Judge, and SWYGERT, Senior Circuit Judge.

POSNER, Circuit Judge.

The National Labor Relations Board found that Loy Food Stores, Inc., the owner of a grocery store in Westville, Illinois, had committed unfair labor practices in the course of a union organizing campaign, in violation of sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (3). The 8(a)(1) findings concern various statements that Loy (or as it is known to the public, Ken's) made to employees about what would happen if the store was organized. Only one of these findings is challenged, and we think the challenge has no merit and is not worth discussing. The 8(a)(3) findings, the focus of the company's attack in this court, concern the discharge of two employees during the organizing campaign. The Board ordered Loy to cease and desist from the unfair labor practices found, to reinstate the two employees, Holycross and Harper, with back pay, and to bargain with the union.

Ken's does not keep its own books of account; instead, as a member of the Independent Grocers of America, a cooperative association of grocery stores, it relies on the IGA's accountants to keep its books and tell it periodically how it is doing. In January 1980, at about the time the union organizing campaign was beginning, Ken's received its end-of-year profit-and-loss statement from IGA. The statement revealed an abnormally low gross profit, and an IGA representative warned Ken's that its ratio of sales revenues to man hours was very poor. The management inquired into the situation and discovered that one reason the ratio was poor was that its teenage stock boys were not "off-pricing" goods promptly and accurately. "Off-pricing" means crossing out the sale price on an unsold item when the sale is over and marking in the old, higher price. Holycross was the stock boy principally responsible for off-pricing, a job he did badly. After being shaken by the adverse financial report, Engle, the store's manager, talked to Holycross in an effort to get him to improve his performance, but

the effort failed, and Engle fired him. When he did so he told Holycross not only that Holycross was no good at off-pricing but also that he, Engle, did not like Holycross's long hair and that Holycross's parents had cheated Engle's son.

Harper, another stock boy, had a long history of unsatisfactory job performance too, and was still employed only because "he was better than nothing." Among other things he and another stock boy had once gotten drunk while sitting in Harper's car in the store's parking lot, and his buddy had driven the car in reverse through the plate-glass window of the store. Harper's duties included "rotating" the cottage cheese and other dairy products. This means putting the fresher items at the back of the shelf so that the older ones will be sold before they spoil. On February 29, 1982, the day after he had fired Holycross, Engle found out-of-date milk and cottage cheese cartons, became angry, and fired Harper.

The Board did not find that Holycross and Harper were good workers. Its reasoning, rather, was that there are no good teenage stock boys to be had in Westville, Illinois; that Ken's was resigned to having lousy ones, as shown by its forbearance regarding Holycross's and Harper's many sins of commission and omission; and that only their adherence to the union caused them to be fired. But the coming of the union was not the only change to which the company's altered attitude toward its stock boys' performance can reasonably be attributed. Another was the discovery, which occurred at the same time, that the store was not operating efficiently, and specifically was not using its manpower efficiently. The old, tolerant ways had proved too costly. The stock boys had to shape up. Holycross and Harper failed to do so and were fired.

The company may not even have known that Holycross and Harper were union adherents. It knew there had been a union meeting which many of the employees had attended but there is no evidence that it knew Holycross had been among them, and the only evidence concerning Harper was the testimony of the union's principal supporter, Miss Nickle, that an assistant manager named Baldwin had told her that Engle had admitted to him, in the words of the administrative law judge, that he "had taken advantage of his discovery of the outdated cottage cheese to fire Harper that morning, instead of implementing his original plan to release Harper that evening after work, because he had heard that Harper had signed a union card." This double hearsay, incorrectly described by the administrative law judge as undisputed, was entitled to little weight in light of Harper's testimony that Baldwin had told Harper he was afraid he would lose his own job if the union got in. This fear gave Baldwin a motive to try to intimidate Miss Nickle by telling her that Harper had been fired for supporting the union. In weighing her testimony, moreover, the Board failed to consider whether firing Holycross and Harper was a plausible method of intimidating the other employees. If Ken's had fired Miss Nickle *that* would have sent a message to the other employees. But Holycross and Harper were not leaders of the union's organizing campaign, or even active supporters. They were teenage goof-offs; their discharge was unlikely to throw fear into the adult work force. This is some evidence that the motive for their discharge was different.

The Board applied in effect a presumption that the discharge of a union adherent during an organizing campaign is motivated by hostility to the union, a presumption that can be rebutted only by showing that the discharge was for good cause—and maybe not even by that. Ken's had plenty of cause to fire Holycross and Harper, yet that did not help it with the Board. Evidently, if a worker is a good worker he cannot be fired if he is a union adherent because the company will not be able to show good cause for firing him, and if he is a bad worker, like Holycross and Harper, he cannot be fired either, for since he was not fired previously this shows that the company does not fire workers because they are bad workers but only because they are union adherents.

The National Labor Relations Act does not give union adherents job tenure, even during union organizing campaigns. The fact that a union is trying to organize the work force does not suspend the company's right to hire and fire—does not even throw on the company the burden of proving that it had a good reason for firing. The company can fire for good, bad, or no reasons, so long as its purpose is not to interfere with union activity. E.g., *Steel Industries, Inc. v. NLRB*, 325 F.2d 173, 176 (7th Cir.1963); *Timpte, Inc. v. NLRB*, 590 F.2d 871, 873 (10th Cir.1979); see *Midwest Stock Exchange, Inc. v. NLRB*, 635 F.2d 1255, 1265 (7th Cir.1980). The Board must and here failed to prove that the employer knew the worker in question was a union adherent, but it cannot stop there. It must show not only that the company knew the worker was a union adherent but that it fired him for that reason. The Board may not assume that that was the reason and place the burden of proving otherwise on the company. No shifting of burdens of proof is proper until the Board has established a prima facie case of discriminatory discharge, and then the only burden that may be shifted is the burden of producing evidence; the burden of persuasion remains always on the Board. *NLRB v. Webb Ford, Inc.*, 689 F.2d 733, 739 (7th Cir.1982).

The part of the Board's order reinstating Holycross and Harper with back pay cannot be enforced, therefore, and with it falls the part directing Ken's to bargain with the union. A bargaining order usually is issued after the union has won a representation election, but if the Board decides that the employer's unfair labor practices have made it impossible to hold a fair election and that the union probably has (or but for the unfair labor practices would have) the support of the majority of the employees in the bargaining unit, it can order the employer to bargain with the union before the election is held, *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 614, 89 S.Ct. 1918, 1940, 23 L.Ed.2d 547 (1969), as it did here. But the Board regarded the discharges of Holycross and Harper as the very culmination of the company's campaign against the union, and

it is not entitled to enter such an order on the basis of the other unfair labor practices in the case. Previous decisions of this circuit indicate that a bargaining order is rarely warranted when the only unfair labor practices are violations of section 8(a)(1), see *First Lakewood Associates v. NLRB*, 582 F.2d 416, 424 n. 5 (7th Cir.1978); *Red Oaks Nursing Home, Inc. v. NLRB*, 633 F.2d 503, 509–10 (7th Cir.1980), and with the discharges of Holycross and Harper out of the picture those are the only violations that remain, and they are minor.

The cease and desist and posting of notices provisions of the Board's order relating to the alleged section 8(a)(1) violations are ENFORCED. Enforcement of the remaining provisions of the order is DENIED.