In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-1970 & 99-2403

Vulcan Basement Waterproofing of Illinois, Inc.,

Petitioner/Cross-Respondent,

v.

National Labor Relations Board,

Respondent/Cross-Petitioner.

On Petition for Review and Cross-Application for
Enforcement of an Order of the National Labor Relations Board
13 CA 34708

Argued December 9, 1999--Decided July 26, 2000

  Before Posner, Chief Judge, and Coffey and Manion,
Circuit Judges.

  Manion, Circuit Judge.  Antonio Maney and J.D.
McClinton were truck drivers for Vulcan Basement
Waterproofing of Illinois, Inc. On occasion they
were known to be foul-mouthed, insubordinate, and
sometimes even violent. They also became involved
in organizing a union. Vulcan claims to have
fired them for their gross misbehavior, but since
the firing occurred in the midst of their union
activity, the National Labor Relations Board
(NLRB) found that Vulcan had committed an unfair
labor practice. Because the NLRB's finding of an
unfair labor practice is not supported by
substantial evidence, we deny its application to
enforce its order and grant Vulcan's petition to
review and vacate it.

I.  Background

  Vulcan is in the business of waterproofing
residential basements. Dennis DeLaura is the
general manager and his subordinate, Tommy Smith,
is the production manager, who organizes,
dispatches and oversees waterproofing crews. A
crew consists of four laborers, a driver and a
foreman. Vulcan has seven foremen and 35
employees. The Senior Foreman, Kevin Naugle,
fills in for Smith when he is absent. Smith is
responsible for hiring and firing laborers and

drivers, although De Laura and Naugle technically possess the authority to do so as well./1 In June 1996, Vulcan hired Maney and McClinton as drivers. They were good friends, and while they were evidently competent drivers, they were not model employees./2

   Significantly in this case, in early October 1996, Vulcan supervisors noticed that the company's two new trucks had been using unusually large amounts of fuel. An inspection revealed that 17-18 gallons of gas were missing from the trucks' reserve fuel tanks up to three times a week. The only way gas could be removed from these tanks is if someone manually extracted it. Because only Maney and McClinton drove these trucks, it appeared that they had been stealing the gasoline, so in mid-October, Smith suspended Maney and McClinton from driving these trucks, pending further investigation. Both Maney and McClinton denied stealing the gasoline and often complained to Smith about being reassigned to drive older trucks. Smith considered terminating them, but did not do so because his vacation was coming up, and he did not want to create staff disruptions while he was absent. Smith was on vacation the week of November 4 to November 8, 1996, and while he was gone, Maney and McClinton were insubordinate and defiant to their superiors. When Smith returned, he fired them. Around this time, Maney and McClinton were also helping to organize a union. Because the incidents of insubordination and the union activity occurred in the same time frame, we will examine each fact situation separately./3

A.  Maney and McClinton's Insubordination

   While Smith was on vacation, Senior Foreman Naugle filled in as Acting Production Manager, as he had done in past years. On Monday, November 4, the first day Smith was gone, Naugle reminded Maney and McClinton that they were not allowed to drive the new trucks due to the investigation into the stolen gasoline. Maney and McClinton argued with Naugle about this, even though they knew Smith had suspended them from driving the trucks. McClinton then disobeyed Naugle's direct order and drove a new truck anyway. As a result, Naugle had to send someone to chase down McClinton and retrieve the truck.

   That same day, Naugle asked Maney, per company policy, for either the toll receipts or if no tolls were needed, the toll money (a few dollars) that Vulcan had advanced him. Maney denied that he had any receipts, and when Naugle pressed him for an accounting, Maney said that he would return the money the next day. At the end of the day, Naugle complained to DeLaura that Maney and

McClinton were giving him a hard time by insisting on driving the new trucks and that Maney had refused to account for the money the company had advanced him for tolls.

Tuesday (national election day) began with Maney announcing that he was taking a company dump truck to go vote. When Naugle told him that he could not use a company truck for that purpose (and that he was supposed to vote before he came to work), Maney responded, "Man, f_ _ _ that." McClinton, too, told Naugle he was going to take a truck so he could vote. As the day progressed, Maney and McClinton became more obnoxious. When Naugle again asked Maney for toll receipts or to return the toll money, Maney said, "Man, I ate those receipts" and ultimately responded "F_ _ _ them $2.00."/4 When Naugle gave McClinton that day's work assignment sheet, McClinton told Naugle to give his job to someone else and threw the sheet on the floor. McClinton then walked over to the door which led to the garage and kicked it so hard he knocked the pin out of it and caused the door knob to pop off.

Naugle was not the only target of Maney's rude behavior that day. While Vulcan's General Manager, DeLaura, was on the telephone with a customer, Maney demanded to use the phone to get a ride home (which he apparently thought was just as important as DeLaura scheduling the next day's work). DeLaura had allowed another employee to use the phone before he had called the customer, so when DeLaura told Maney he had to wait, Maney turned around to other employees who were present and said "This place is tripping" and "What the f_ _ _?". Maney continued to complain, saying "This place is bull_ _ _ _; I'm not going to stick around here." DeLaura let Maney use the phone, but angrily told him he was out of line, and asked him if he wanted to continue working./5

On Wednesday (November 6), Naugle again spoke with DeLaura about the problems Maney and McClinton were causing and recommended that they be fired "because they were nothing but trouble to the company." DeLaura said they should wait until Smith returned to get rid of them because DeLaura did not want to make any changes in Smith's absence. As noted, it was well-established company policy for Smith to terminate employees, despite Naugle and DeLaura's authority to do so. Later that day, Smith called DeLaura from his vacation to discuss giving a raise to another employee. At that time, DeLaura told Smith, without going into details, that he and Naugle were having a lot of problems with Maney and McClinton.

The next day (Thursday), the problems continued.

McClinton did not show up for work, and he did not call in "sick" until 9:30 a.m., even though Vulcan requires employees who are going to miss work to notify it by 7:00 a.m. so it can alter work assignments or arrange for replacements. McClinton missed work on Friday, too, and he did not call Vulcan until about 8:00 a.m. (As will be discussed, on this day the NLRB faxed Vulcan a union election petition.)

On Sunday, November 10, Smith returned home from his vacation to find a message from DeLaura urgently asking Smith to call him. When Smith called DeLaura back that evening, DeLaura told him about Maney and McClinton's behavior and stated that they had "turned the place upside down while [Smith] was gone" and had caused a lot of trouble. When DeLaura mentioned Maney and McClinton's protests over not being allowed to drive the new trucks, Smith remarked that he was going to get rid of them because they knew they were on probation (by which Smith meant that Maney and McClinton were suspended from driving the new trucks). The next day, Smith fired Maney and McClinton when they arrived for work (discussed below).

B.  Union Organizing at Vulcan

While Smith was on vacation, union activity at Vulcan (in addition to Maney and McClinton's antics) heated up. The idea of unionizing Vulcan first arose in mid-July 1996 when Senior Foreman Naugle initiated a discussion with his crew, one of whom was McClinton, about benefits and holidays. Naugle asked McClinton what he thought about union representation. McClinton responded that he thought it was a good idea, and during the following weeks, McClinton discussed the idea with co-workers.

About the third week of October, Maney, a former member of the International Brotherhood of Teamsters, Local 714 ("Union"), began discussing union representation with co-workers, including foremen, at Vulcan's garage and at job sites. Vulcan's employees, including its foremen, responded positively. On October 25, Maney contacted a Union representative, and three days later he and McClinton stood outside Vulcan's gates and garage distributing union authorization cards as co-workers and foremen arrived for work. Most employees and all the foreman signed union authorization cards. Significantly, Senior Foreman Naugle was among the signers. Maney gave the authorization cards to the Union, and on November 1, he told co-workers about a meeting he had scheduled with a Union representative and encouraged employees and foremen to attend. On Tuesday, November 5 (by which time Smith was on

vacation and Maney and McClinton's misbehavior was well underway), the Union filed an election petition with the NLRB, seeking an election at Vulcan. Three days later (Friday), the NLRB faxed the petition to Vulcan. The petition did not recite any names of Vulcan employees who wanted the election.

On Monday, November 11 (the day Smith returned to work from vacation), a Union representative met with Vulcan employees at around 6:00 or 6:30 a.m. at a restaurant about one mile from the facility. Both Maney and McClinton attended the meeting. They arrived at work at 7:05 a.m, and as they were clocking in, Smith told them they were terminated. When they asked why, he said that they knew why. When pressed, he told them that while on vacation, he had received a phone call from DeLaura, and that DeLaura wanted them fired as soon as Smith returned. Smith said that if they wanted their jobs back, they would have to speak with DeLaura, and that if DeLaura approved, Smith would not have a problem rehiring them. Maney and McClinton left the facility and called DeLaura a couple of hours later asking why they were fired. DeLaura said it was Smith's decision, and that he was standing behind Smith 100%. McClinton pressed DeLaura for a reason, and he said that they were not team players, but added that he would not give them a bad reference.

C.  The ALJ's and Board's Decisions

Maney and McClinton complained to the Union about getting fired, and the Union promptly filed a charge with the NLRB. The NLRB issued a complaint against Vulcan, alleging that it had discharged Maney and McClinton because of their union activities in violation of Sections 8(a)(1) and (3) of the National Labor Relations Act (the "Act"). After a hearing, an administrative law judge agreed. There was no evidence that DeLaura or Smith knew of Maney and McClinton's union activities (DeLaura and Smith both testified that they were unaware of such activity). Senior Foreman Naugle of course knew about their activities, but he denied that he had told DeLaura or Smith about them. The ALJ found Naugle not  credible, concluding that he disliked Maney and McClinton so much that he would have told DeLaura about their union organizing (even though Naugle himself had signed a union authorization card). The ALJ "bolstered" his finding that Vulcan knew of Maney and McClinton's union activities by invoking the "missing witness" rule./6 He also found that based on the timing of the firings, Vulcan's failure to investigate the charges against Maney and McClinton, its failure to give specific reasons for firing them, and what he viewed as Vulcan's shifting explanations, Vulcan fired Maney and McClinton

because of their union activities. The ALJ rejected Vulcan's affirmative defense that, assuming Maney and McClinton's union activity was a factor in their termination, Vulcan would have fired them anyway for their misbehavior. He concluded that Vulcan would not have done so because it had exaggerated their misbehavior and had tolerated bad behavior in the past. In this regard, the ALJ disbelieved DeLaura and Naugle's explanation that they did not fire Maney and McClinton while Smith was gone because Smith had always implemented termination decisions.

Vulcan appealed to the NLRB, contending that many of the ALJ's findings of fact and credibility determinations were incorrect and not supported by the record and that his legal conclusions were erroneous. It also moved to reopen the record to admit McClinton's guilty plea to a charge of criminal misconduct that stemmed from his threat to assault Naugle because Naugle testified unfavorably during Maney's post-termination unemployment compensation hearing. Vulcan sought to use the guilty plea to show that the ALJ had erred in finding as not credible Naugle's testimony that Maney and McClinton abused him. The NLRB denied Vulcan's motion to re-open the record, and it affirmed without much modification the ALJ's ruling that Vulcan had violated the Act. Vulcan, 327 NLRB No. 170, 1999 WL 183660, at *1. The NLRB clarified that as to Vulcan's purported knowledge of Maney and McClinton's union activities, it was relying on the ALJ's credibility determinations that Naugle told DeLaura of these activities, emphasizing that Naugle "played a key role in the discharge decision." Id. The NLRB disclaimed any reliance on the "missing witness rule" to establish Vulcan's knowledge. Id. at *n.3. It ordered Vulcan to cease and desist from engaging in unfair labor practices, to offer reinstatement to Maney and McClinton, to make them whole, and to remove from its files any reference to their "unlawful discharges." It also required Vulcan to post for 60 days a notice stating, among other things, that the NLRB found that Vulcan had violated the Act and that Vulcan would not do so again. Id. at *2.

Vulcan petitions us to review and vacate the NLRB's order, and it appeals the NLRB's decision not to re-open the record. The NLRB cross-applies for us to enforce its order. We have jurisdiction pursuant to Sections 10(e) and (f) of the Act. See 29 U.S.C. sec.sec. 160(e) and (f).

II.  Discussion

Section 8(a) of the Act provides that "It shall be an unfair labor practice for an employer--(1)

to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [29 U.S.C. sec. 157]; . . . [or] (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ." See 29 U.S.C. sec. 158(a). An employer thus violates Section 8(a)(1) or (3) of the Act by firing employees because of their union activities. To prove a violation, the NLRB's General Counsel must "prove that antiunion animus was a substantial or motivating factor in the employer's decision to make adverse employment decisions." Weiss, 172 F.3d at 442. If he proves such a motivation by a preponderance of the evidence, the employer can then avoid a finding of an unfair labor practice if it can show that it would have taken the action regardless of the employee's union activities. Id. But the employer need not establish this affirmative defense until the General Counsel has met his burden. Id.

"To establish that anti-union animus was a substantial or motivating factor in [a] discharge, [the General Counsel] must demonstrate that: (1) [the employee] 'engaged in union . . . activities; (2) the employer knew of [the employee's] involvement in protected activities; (3) the employer harbored animus toward those activities; and (4) there was a causal connection between the employer's animus and its discharge decision.'" Lebow v. American Trans Air, Inc., 86 F.3d 661, 666 (7th Cir. 1996) (quoting Carry Companies of Ill., Inc. v. NLRB, 30 F.3d 922, 927 (7th Cir. 1994)). The General Counsel can prove his case with direct or circumstantial evidence. Id. But the NLRB's legal conclusions must have a reasonable basis in the law, and its factual findings must be supported by substantial evidence, which "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Weiss, 172 F.3d at 442. At oral argument, the General Counsel told us that the "substantial evidence" test is met if the NLRB's findings are not "fundamentally unreasonable." We accept this description of the test, and conclude that the NLRB's findings in this case were in fact fundamentally unreasonable.

A.  The General Counsel's Case

No one disputes that Maney and McClinton had been engaging in protected activity at the time they were fired. But the decision-makers at Vulcan had to know of these activities. The direct evidence was undisputed that Naugle did not tell DeLaura about Maney and McClinton's union organizing. Thus, to meet the second

element of the test (employer knowledge), the ALJ either had to disbelieve Vulcan's witnesses and infer from circumstantial evidence that Naugle did in fact tell DeLaura of the protected activity, or he had to somehow "impute" Naugle's knowledge of these activities to the company as a matter of law. Citing GATX Logistics, Inc. 323 NLRB 328, enforced, 160 F.3d 353 (7th Cir. 1997), the General Counsel has put together a unique formula by arguing that we should impute Naugle's knowledge to Vulcan because it is likely that he actually told the company about Maney and McClinton's union activities./7 See Response Brief at 23 (arguing that the NLRB reasonably imputed Naugle's knowledge to Vulcan because "it is most improbable" that Naugle would not have told DeLaura). The General Counsel can't have it both ways. And it is doubtful he can have it either way. As shown below, it is not reasonable either to impute Naugle's knowledge of Maney and McClinton's union activities to Vulcan or to infer that Naugle in fact told DeLaura of their activities.

First, regarding imputation, courts have generally rejected the NLRB's attempts to simply attribute a foreman or supervisor's knowledge of an employee's union activities to the company./8 Automatically imputing such knowledge to a company improperly removes the General Counsel's burden of proving knowledge. We have rejected other attempts by the General Counsel to so lighten his burden of proof. See Weiss, 172 F.3d at 444 (discussing "adverse inference" rule) ("An absence of evidence does not cut in favor of the one who bears the burden of proof."). And we reject any attempt to do so here: Vulcan or its decision-maker (be it DeLaura or Smith) did not know of Maney and McClinton's union activities just because Naugle knew about them.

The General Counsel cites Grand Rapids Die Casting Corp. v. NLRB, 831 F.2d 112 (6th Cir. 1987), as support for the NLRB imputing Naugle's knowledge to Vulcan. But the General Counsel misreads that case. Grand Rapids said that the Board could impute the anti-union animus of a supervisor to a company when the supervisor knew of an employee's union activities and was involved in the decision to terminate the employee. This was true even though the supervisor was not the decision-maker and there was no evidence that the actual decision-maker knew of the employee's union activities or had an anti-union animus. Id. at 117. The rationale for doing so was that the supervisor is an agent of the company, and he (and thus "the company") should not be allowed to concoct some "union-neutral" charge about an employee in order to get the employee fired.

[A] supervisor's unlawful, anti-labor motivation in making a false report leading to discharge must be imputed to the Company, even though the officers who actually make the firing decision do not share that animus. Thus, the Company is deemed to possess the unlawful animus.

Id. (emphasis added) (quoting JMC Transport, Inc. v. NLRB, 776 F.2d 612, 619 (6th Cir. 1985)). In short, the supervisor should not be allowed to "launder" his anti-union animus through the apparent non-discriminatory action of the decision-maker who is personally unaware of the employee's union activism. Boston Mut. Life Ins. Co. v. NLRB, 692 F2d 169, 171 (1st Cir. 1982)./9

If we were to apply the imputation of animus principle with respect to Naugle, Vulcan would benefit. The animus, good or bad, should follow the supervisor. Thus, while Naugle may have had an "anti-Maney and McClinton" animus, he did not have an anti-union animus. Naugle was pro-union. Recall that weeks earlier he initiated the idea of having a union and later signed a union authorization card. If anything, his pro-union attitude should be attributed to Vulcan, and the fact that he recommended firing Maney and McClinton anyway underscores that Vulcan fired them for their misbehavior, not their union activities. In sum, anti-union animus attributed to Naugle cannot be imputed to Vulcan because there is not any evidence (let alone substantial evidence) that he had any.

On the subject of actual knowledge, the NLRB could conceivably infer from circumstantial evidence that despite his denials, Naugle told Vulcan about Maney and McClinton's union activities. Perhaps the NLRB concluded that Naugle reported their activity because he was involved in their firing and because it believed he would be loyal to the company when it came to union organizing. The NLRB drew such an inference in GATX (see note 7, supra). But the critical difference between this case and GATX is that the GATX supervisor who was involved in firing an employee not only knew of the employee's pro-union activities but was blatantly hostile to the union. For instance, upon seeing the employee wearing a jacket with a union logo, the GATX supervisor "stared at the union logo and commented, 'That won't go over too well here,' referring to the Union." 323 NLRB at 300. He later told the employee "'That's an awfully big target you have on your back,' referring to the larger union logo on the back of [his] jacket." Id. And he "angrily commented . . . that there 'was no damn way there was going to be Union [at

work], and that he would see to that.'" Id. at 331. Given that supervisor's extreme anti-union animus, it was reasonable for the NLRB to infer that he told the decision-maker of the employee's union activities. See id. at 333; n.7, supra.

There is no comparison between Naugle and the GATX supervisor. As noted, far from being anti-union, Naugle was a union adherent. Why would a pro-union foreman attempt to malign subordinates by labeling them pro-union? And if he had any indication that the company was anti-union, why would he jeopardize his own career?/10

Similarly, we find no support for the inference that Naugle told DeLaura of Maney and McClinton's union activities simply because Naugle disliked them and wanted them fired. Vulcan, 327 NLRB No. 170, 1999 WL 183660, at *21 (The ALJ surmised that "Naugle falsely exaggerated the misconduct of Maney and McClinton . . . . If Naugle wanted the two drivers terminated as much as he did, it is inconceivable that he would not have reported their union activities to DeLaura."). Whether Naugle liked them or not, it is likely that he reported their misconduct because it was unacceptable. Cf. Jim Walter Resources Inc., 177 F.3d at 962-63 (NLRB could not simply assume that employee's criticism of applicant to decision-maker was based on anti-union animus rather than another reason).

The inability of the NLRB to base Vulcan's knowledge of Maney and McClinton's union activities on Naugle's knowledge of them is critical because there is not substantial evidence to support a finding that DeLaura otherwise knew of these activities. The NLRB has disclaimed use of the "missing witness rule"; the union election petition did not list any names; Naugle testified that he did not tell Smith or DeLaura about union organizing in general or about Maney and McClinton's union activities in particular; and Smith and DeLaura testified that they were unaware of union activity at Vulcan and of Maney and McClinton's union activism. Even if Smith and DeLaura knew of the union movement in general--and there appears to be no evidence of that either--there is no evidence that they knew about Maney and McClinton's involvement in it. Such knowledge is essential to the General Counsel's case. See NLRB v. Loy Food Stores, Inc., 697 F.2d 798, 800-01 (7th Cir. 1983) (The company "knew there had been a union meeting which many of the employees had attended but there is no evidence that it knew [the employees in question] had been among them . . . .The Board must and here failed to prove that the employer knew the worker in question was a union adherent . . . .").

And even if the General Counsel could establish that Vulcan's officers directly or indirectly knew of Maney and McClinton's union activities, there is no evidence of any anti-union animus. Contrast Weiss, 172 F.3d at 443 ("The record certainly establishes that Weiss's management opposed the union in the election and encouraged employees to vote against it--as was their right."). On the contrary, the record shows only pro-union sentiment from those in supervisory positions: all the foremen, including Senior Foreman Naugle, signed union cards.

The NLRB relies on the timing of the firings--on Monday, the first business day after Vulcan received the NLRB petition--to show Vulcan's anti-union animus and causation. Vulcan, 327 NLRB No. 170, 1999 WL 183660, at *23. While in some cases, "timing is everything," NLRB v. Joy Recovery Tech. Corp., 134 F.3d 1307, 1314 (7th Cir. 1998), here timing is the only thing, and under these facts that is not enough. See Chicago Tribune Co. v. NLRB, 962 F.2d 712, 717-18 (7th Cir. 1992) ("mere coincidence is not sufficient evidence of antiunion animus"). Smith considered firing Maney and McClinton before he went on vacation, and his decision not to do so eliminated a need to replace the two drivers before he left, which would have left the company in a bind and messed up his vacation plans. When he returned Sunday evening, DeLaura told him about their insubordination while he was away. The accumulated gross misbehavior during Smith's absence led him to discharge them promptly when he (and they) returned to work. Unlike the General Counsel, we do not think it is "highly suspect" that Smith considered and, for the time being at least, rejected firing Maney and McClinton before he went on vacation.

The General Counsel also argues that Smith and DeLaura's failure to give Maney and McClinton a reason for their discharges, even though they repeatedly asked for one, is suspicious, as is Vulcan's failure to investigate the charges against them. Vulcan, 327 NLRB No. 170, 1999 WL 183660, at *22. An employer is not required to give reasons when it fires its employees (although under some circumstances failing to do so might give rise to an inference of antiunion animus). "The fact that a union is trying to organize the work force . . . does not even throw on the company the burden of proving that it had a good reason for firing. The company can fire for good, bad, or no reasons, so long as its purpose is not to interfere with union activity." Loy Food Stores, Inc., 697 F.2d at 891; accord Carry Companies of Ill., Inc., 30 F.3d at 926; Chicago Tribune Co., 962 F.2d at 716. But Smith

essentially did give Maney and McClinton a reason: he told them they knew why they were being fired, as well they should have. When employees openly engage in gross misbehavior, their employer is not required to state or investigate the obvious.

The General Counsel also asserts that Smith and DeLaura gave conflicting statements as to who made the decision to fire Maney and McClinton. See Vulcan, 327 NLRB No. 170, 1999 WL 183660, at *22. But their statements are not really inconsistent. DeLaura, as the head of the facility, was technically or formally in charge of terminations, and he was greatly displeased with Maney and McClinton's behavior. But it was company practice for Smith to be the real decision-maker, or at least the executioner, in such matters. It was thus entirely logical for Smith to tell Maney and McClinton that DeLaura was upset with them and wanted them fired (DeLaura, after all, had to deal with their misbehavior while Smith was away). It was also logical for DeLaura to tell Maney and McClinton that, while it was Smith's decision, he would stand behind Smith 100 percent. In short, both Smith and DeLaura wanted Maney and McClinton fired. No doubt neither wanted to confront Maney and McClinton directly, given their past behavior./11

Finally, the General Counsel claims Vulcan's "shifting reasons" for the firings indicates Maney and McClinton's union activity was a factor in their termination. The ALJ found that Vulcan's pretrial "position statement asserted that the two drivers were discharged 'for a combination of theft, insubordination and failing to show up for work.'" Id. DeLaura indicated that they were fired for these offenses, see id. at *11, but according to the ALJ, "Smith's testimony shifted away from and did not support that position. . . . According to Smith, the issue was the demanded use of the newer trucks." Id. at *22. Smith was particularly upset with Maney and McClinton for these demands, but he also indicated that Maney and McClinton's other instances of misbehavior were factors in their termination./12 Smith's "different emphasis," as the ALJ put it, id. at *11, for firing them is understandable. Unlike Naugle and DeLaura, Smith did not have to put up with Maney and McClinton's antics during November 4 to November 8; he was on vacation. What Smith had to endure before he went on vacation was their repeated complaints about being suspended from driving the new trucks. It is only natural that in discussing their termination, Smith would focus on the aspect of Maney and McClinton's behavior that had most affected and bothered him (and for which he had considered firing them

before he left). An understandably "different emphasis" in reasons should not be discarded as "shifting reasons." Where, as here, there are multiple bona fide reasons for firing an employee, the fact that different supervisors with different experiences cite or emphasize different legitimate reasons does not give rise to a reasonable inference of an unlawful motive./13

B.  Vulcan's Affirmative Defense

   Even if the General Counsel had proven that Vulcan's dislike of Maney and McClinton's union activities was a factor in its decision to fire them, substantial evidence does not support the NLRB's finding that Vulcan would not have fired them anyway for legitimate reasons. See Vulcan, 327 NLRB No. 170, 1999 WL 183660, at *23. Although the General Counsel contends that Vulcan exaggerated some of Maney and McClinton's antics, he agrees that they committed the offenses of which Vulcan accused them (see n.3): apparent theft (the missing gasoline from the new trucks), threatened theft (trying to take a company truck to go vote), insubordination (taking a new truck to a job site, not calling in timely before missing work), violence (kicking a door so hard the knob and pins pop off) and grossly obnoxious behavior (interfering with the General Manager's use of a telephone and refusing to account for toll money). But he nevertheless argues that Vulcan would not have fired them for this gross misbehavior because it had tolerated their bad behavior in the past, including complaints about being unable to drive the new trucks./14
   An employer who has tolerated bad behavior in the past is not forced to continue to do so, let alone required to tolerate increasingly bad behavior. See NLRB v. Eldorado Mfg. Corp., 660 F.2d 1207, 1214 (7th Cir. 1981) ("The Board's case against the Company rests at bottom on the apparent notion that blatant misconduct once tolerated at all must be tolerated forever. However, as this Court has previously stated, there must be room in the law for a right of an employer somewhere, sometime, at some stage to free itself of continuing unproductive, internal, and improper harassment."). Thus, even though Smith declined to fire Maney and McClinton for their repeated complaints or for suspicion of stealing gasoline before he went on vacation, he could change his mind once he returned and learned of their escalated misbehavior while he was away.

The Board applied in effect a presumption that the discharge of a union adherent during an organizing campaign is motivated by hostility to the union, a presumption that can be rebutted

only by showing that the discharge was for good cause--and maybe not even then. [The company] had plenty of cause to fire [its two employees], yet that did not help it with the Board. Evidently, if a worker is a good worker he cannot be fired if he is a union adherent because the company will not be able to show good cause for firing him, and if he is a bad worker, like [the two employees here], he cannot be fired either, for since he was not fired previously this shows that the company does not fire workers because they are bad workers but only because they are union adherents.

Loy Food Stores, Inc., 697 F.2d at 800. Substantial evidence, therefore, does not support the NLRB's finding that Vulcan would not have fired Maney and McClinton anyway for legitimate reasons.

III. Conclusion

A union card does not insulate bad behavior. "The National Labor Relations Act does not give union adherents job tenure, even during union organizing campaigns. The fact that a union is trying to organize the work force does not suspend the company's right to hire and fire . . . ." Id. at 801.

For the foregoing reasons, we GRANT Vulcan's petition for review and VACATE the NLRB's order. We consequently DENY the NLRB's cross-application to enforce its order. And we determine that Vulcan's request that we reverse the NLRB's decision not to re-open the record to admit McClinton's guilty plea is MOOT.


/1 In his six years as Senior Foreman Naugle has fired only one person; Smith has made the decision for every other laborer or driver who was fired. In the last five years, Vulcan has fired 15-25 drivers and 25-30 laborers, all by Smith, none by DeLaura.

/2 In mid-August 1996, for example, Maney knowingly participated in unauthorized work for a noncustomer for which his employer, Vulcan, was not paid. Maney's entire crew, including the foreman, was involved. Vulcan fired the foreman and required the crew to reimburse the company.

/3 Vulcan contends that Maney and McClinton often used profanity in their run-ins with Naugle and DeLaura during the week that Smith was on vacation. The ALJ, however, found a more sanitized version of Maney and McClinton's insubordinate behavior. See Vulcan Waterproofing

Co., 327 NLRB No. 170, 1999 WL 183660, at *19 (March 31, 1999). But even though the General Counsel argues to us that Vulcan has "exaggerated" some of Maney and McClinton's misbehavior, he seems to agree with Vulcan that Maney and McClinton did abuse Naugle and DeLaura with profanity, noting only that such profanity was "commonplace" at Vulcan. See Response Br. at 32 n.10. More importantly, the General Counsel acknowledges that with respect to each instance of insubordination and misbehavior, "it is undisputed that those incidents occurred." Id. at 31 (emphasis added).

/4 The transcripts of the hearing before the Administrative Law Judge indicate that the "F-word" and its cognates form a substantial part of Maney and McClinton's vocabulary.

/5 The ALJ found that Maney engaged "in some provocative behavior" (such as by telling coworkers that DeLaura was "tripping"), but the ALJ applied the missing witness rule to conclude that a less disruptive version of this incident had occurred: because Vulcan did not call witnesses to corroborate DeLaura's version, the incident must not have been as bad as DeLaura described. See Vulcan, 327 NLRB No. 170, 1999 WL 183660, at *17. The NLRB, however, has distanced itself from the ALJ's use of the missing witness rule, and given this court's skepticism of this rule, the NLRB is wise to do so. See NLRB v. Louis A. Weiss Mem'l Hosp., 172 F.3d 432, 445-46 (7th Cir. 1999); see also Jim Walter Resources, Inc. v. NLRB, 177 F.3d 961, 963 (11th Cir. 1999) (rejecting use there of missing witness rule). For example, at oral argument the General Counsel called Vulcan's criticism of this rule a "red herring" because the NLRB had decided not to rely on it (as the ALJ had done) in finding that Vulcan knew of Maney and McClinton's union activities. And the General Counsel has not defended the ALJ's use elsewhere of this rule. Because the ALJ's decision to disbelieve DeLaura's version of the phone incident was based in large part on the application of the questionable missing witness rule, we cannot accept the ALJ's assumption of what occurred.

/6 The ALJ observed that other foremen besides Naugle knew of and even participated in Maney and McClinton's union activities, and he presumed that such foremen would be "friendly" to the company. The only reason, the ALJ concluded, that Vulcan did not call these knowledgeable and "friendly" foremen to support its asserted lack of knowledge of Maney and McClinton's union activities, must be because these foremen would not support Vulcan on this point. He thereby inferred that these "missing witnesses" must have

told Vulcan about Maney and McClinton's union activities (activities, of course, in which the foremen were also involved). See Vulcan, 327 NLRB No. 170, 1999 WL 183660, at *20.

/7 A close reading of GATX reveals that the NLRB did not impute the supervisor's knowledge of the employee's union activities to the decision-maker. Rather, the ALJ there noted that the NLRB's decision in United Cloth Co., 278 NLRB 583 (1986), would allow him to do so. But he then concluded that, as a matter of fact, it was reasonable to infer that the supervisor told management of the employee's union activities because the supervisor vehemently disliked the union. See GATX, 323 NLRB at 333 ("In any event, given [the supervisor's] overall lack of credibility as a witness, and his comments . . . about fixing [the employee's] 'attitude' problem and how he would see to it that the Union was not brought in, I am convinced that [the supervisor] did indeed inform" management about the employee's union activities.) (emphasis added). Thus with actual knowledge found, no imputation was necessary.

/8 See NLRB v. McCullough, 5 F.3d 923, 932 (5th Cir. 1993); Pioneer Natural Gas Co. v. NLRB, 662 F.2d 408, 412 (5th Cir. Unit A Nov. 1981); Delchamps, Inc. v. NLRB, 585 F.2d 91, 94 (5th Cir. 1978) (the NLRB may not "mechanically impute the knowledge of others to" the decision-maker); see also Jim Walter Resources, Inc., 177 F.3d at 963 ("In a refusal to hire case the Board may not impute the knowledge of a low-level supervisor to a decision-making supervisor."); but see Ready Mixed Concrete Co. v. NLRB, 81 F.3d 1546, 1552 (10th Cir. 1996) (imputing supervisor's knowledge of employee's union activities to company where supervisor had anti-union animus, but acknowledging that decision-maker admitted he probably knew of employee's union activities).

/9 The General Counsel's theory is not that Naugle drummed-up a bogus charge against Maney and McClinton in order to get them fired. See JMC Transport, supra. But even if he did, for Vulcan to vicariously have an anti-union animus for firing Maney and McClinton under this theory, Naugle must have had an anti-union motive for fabricating the charge, id., as opposed to fabricating it because he generally disliked Maney and McClinton. Naugle certainly had problems with the two men, but there is no indication he had any anti-union animus (discussed, infra).

/10  Despite Naugle's union sympathies, the ALJ concluded that he could have been an "undercover informer" and thus told DeLaura about Maney and

McClinton's union activities. Vulcan, 327 NLRB No. 170, 1999 WL 183660, at *21. This crosses the line from reasonable inference to wholesale speculation. If the General Counsel "wanted to create a record from which this inference could be drawn, [he] needed to elicit some testimony on the matter." Weiss, 172 F.3d at 445. Moreover, and as noted, this theory does not even make sense and thus raises questions about the ALJ's objectivity. The NLRB should not brand Naugle a spy or conspirator (and ultimately Vulcan a lawbreaker) based upon an unsubstantiated and illogical "secret agent man" theory.

/11 To show Maney and McClinton's propensity for abusive behavior, Vulcan requests that we reverse the NLRB's denial of its motion to reopen the record to admit McClinton's guilty plea to a charge of criminal misconduct that allegedly stemmed from his threat to assault Naugle after Maney's post-termination unemployment compensation hearing. Because we are vacating the NLRB's order in this matter, we need not decide whether it properly refused to reopen the administrative record.

/12 Smith testified: "Well, [DeLaura] was telling me that . . . J.D. [McClinton] and Toney [Maney] they, like, 'turned the place upside down while you were gone.' He said, 'man, we had a lot of trouble out of them,' . . . and he was telling me that J.D. kicked a door in, Tony got into it with Kevin [Naugle] about the trucks. I said 'hold it. They knew they was on probation for [i.e., were suspended from driving] them trucks [sic].'" Id. at *11.

/13 We will not consider Vulcan's argument that the NLRB improperly shifted the burden of proving union animus because Vulcan did not raise it until its reply brief. See Holman v. Indiana, 211 F.3d 399, 405 n.5 (7th Cir. 2000).

/14 The General counsel also argues that Vulcan did not list these incidents as reasons for firing Maney and McClinton; it only listed their complaints about being suspended from driving the new trucks. As we noted, it is not reasonable to pigeonhole Vulcan's reasons in this way.