In the

# United States Court of Appeals
## for the Seventh Circuit

Nos. 22-3178 & 23-1025

CAPITOL STREET SURGERY CENTER, LLC,

*Petitioner/Cross-Respondent*,

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner*.

Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board.
No. 25-CA-271204

ARGUED SEPTEMBER 27, 2023 — DECIDED DECEMBER 12, 2024

Before SYKES, *Chief Judge*, and FLAUM[*] and LEE, *Circuit Judges*.

SYKES, *Chief Judge*. Capitol Street Surgery Center, an outpatient surgical clinic, provides interventional radiology services, among other day-surgery procedures. In 2019, Capitol

---

[*] Circuit Judge Flaum died on December 4, 2024, so this appeal is being resolved by a quorum of the panel. *See* 28 U.S.C. § 46(d).

hired Marty Lauster, a licensed interventional radiology technologist—an "IR tech" as they're known in the field—to assist with the care of patients in the clinic's operating rooms. Among other responsibilities, an IR tech operates an imaging device called a C-arm, which produces real-time imaging that guides the physician during procedures.

In November 2020 Capitol's IR staff met to discuss work responsibilities. The lead IR tech announced that Brandon Ehret, the clinic's top administrator, wanted to assign a nurse to move the C-arm into position before surgeries begin in the morning. Lauster interjected that nurses are not permitted to operate a C-arm. Two weeks later Ehret fired him.

Lauster filed a charge of unfair labor practices with the National Labor Relations Board. He claimed that Ehret—who did not attend the staff meeting—fired him because of his objection to a nurse moving the C-arm. The agency's General Counsel issued a complaint alleging that Capitol discharged Lauster based on his concerted labor activity in violation of section 8(a)(1) of the National Labor Relations Act. *See* 29 U.S.C. § 158(a)(1). Capitol responded that Lauster was discharged because of performance problems that threatened patient safety, not because of his C-arm comment.

An administrative law judge ("ALJ") heard the parties' evidence, including unrebutted testimony from Ehret that he did not know about Lauster's C-arm comment when he made the discharge decision. His testimony was corroborated by the lead IR tech who ran the meeting and later briefed Ehret on what had transpired; she testified that she did not tell him about Lauster's brief remark. After the hearing, the ALJ left the agency without issuing a decision and another one resolved the case based on the paper record. The new ALJ found

that Capitol fired Lauster because of his protected activity and issued a make-whole award. The Board affirmed, and Capitol petitioned for review.

We grant the petition and vacate the award. To prove a prima facie section 8(a)(1) violation, the Board must establish three elements: (1) an employee engaged in protected labor activity; (2) the employer's decisionmaker was aware of the protected activity; and (3) the decisionmaker took adverse action against the employee because of animus or hostility toward his protected activity. The first element is not in dispute here, but the Board's case fails at the second and third. Despite uncontradicted testimony to the contrary, the ALJ found that Ehret was aware of Lauster's C-arm remark and fired him because of animus toward it. Those findings are not supported by substantial evidence.

## I. Background

Capitol Street Surgery Center, located in Indianapolis, offers a range of outpatient surgical services, including interventional radiology ("IR") procedures and orthopedic surgeries. During the time period at issue here, Dr. Sanjay Mohindra performed Capitol's IR procedures. Dr. Mohindra was an independent contractor, but Capitol employed a staff of nurses and IR techs to assist him. Brandon Ehret, Capitol's administrator, was responsible for all personnel decisions and the day-to-day business operations of the clinic.

The job duties of an IR tech include setting up the operating rooms before surgery, operating the imaging equipment during procedures, and otherwise assisting the physician in the operating room. IR procedures commonly use a C-arm, an advanced radiographic device that produces high-resolution,

real-time imaging to guide the physician during the procedure. Indiana requires a license to operate a C-arm. Capitol's IR techs were licensed; its registered nurses were not.

Capitol's administrators and staff disagreed among themselves over which C-arm tasks require a license and which do not. As just noted, a license is required to operate the C-arm during procedures. But Ehret and others believed that simply moving the C-arm into the operating room and positioning it before surgery—what he called "running" the C-arm—does not require a license because it is a routine preparatory task that does not involve operating the device.

Capitol hired Lauster as an IR tech in February 2019. He worked under lead IR techs Danielle Mohindra (Dr. Mohindra's wife) and Jenny Lozano. In December of that year—ten months after joining Capitol—Lauster met with Ehret and Shannon Genovese, the clinic's director of nursing, for a performance evaluation. The review was largely positive; the written evaluation said Lauster was a dependable employee and checked the boxes signifying that he usually or always met or exceeded performance standards. But the evaluation also noted future improvement goals: "Marty needs to work on being more focused in the procedures, by paying attention [and] anticipating the needs of the case [and] physician."

About a year later, on November 5, 2020, Capitol's IR staff and Dr. Mohindra held a meeting to discuss problems with inventory control and other work issues. Before the meeting, lead IR techs Danielle Mohindra and Jenny Lozano prepared the agenda, and Danielle reviewed it with Ehret over the phone. Ehret was not planning to attend the meeting (he rarely did so), but he wanted Danielle to address certain C-

arm issues with the IR staff. He instructed her to add this item to the agenda:

> 6. Tech to run C-arm in [operating room]:
>
>> —Brandon would like us to rotate into [orthopedic room] when C-arm is needed during our working hours. Chelsy will run C-arm (early) cases.
>>
>> —No one should be in breakroom when C-arm is in us[e] in [orthopedic room].
>>
>> —1 Tech must go

Ehret added this agenda item because he did not want to pay IR techs overtime to "run" the C-arm before the early-morning surgeries. (Again, that's the term he used for moving the C-arm into position in the operating room.) He planned to assign that early-morning task to Chelsy Perry, a registered nurse. He also wanted to remind the IR techs that when they had downtime between IR procedures, they were expected to assist in the orthopedic rooms rather than hanging out in the breakroom.

In attendance at the November 5 meeting were Dr. Mohindra, Danielle Mohindra, Lozano, Lauster, and IR techs Amber Rollins and Cassandra Shepard. As expected, Ehret did not attend. Danielle Mohindra ran the meeting, and Shepard recorded it on her phone for her own work-improvement purposes. When Danielle reached agenda item six, she described Ehret's instructions about running the C-arm: "If the case starts super early, then Chelsy will run [the C-arm] for us, but during the hours that we are scheduled to be here, one of us ha[s] to be over there." Because Chelsy Perry is a nurse rather than a licensed IR tech, Dr. Mohindra asked, "Is she allowed

to work the C-arm?" Danielle responded, "Yeah." Lauster immediately replied, "No. … She's an RN." Rollins added: "They're technically not supposed to push the button … ."

Lauster started to speak again but others talked over him, making the conversation inaudible. Soon Dr. Mohindra commented, "[I]t's a stupid rule, but it is a rule," after which Rollins added, "It's prosecutable by law." Dr. Mohindra then shifted the conversation and complained at length about the condition of Capitol's C-arm machines, its reluctance to pay overtime, and other grievances about clinic management. Shepard titled the recording the "Mohindra Rant." The meeting took about 90 minutes in total; the C-arm discussion lasted only 5 minutes. Danielle later gave Ehret a verbal summary of the meeting, but she did not mention Lauster's comment that the nurse was not permitted to run the C-arm.

On November 18—about two weeks later—Lozano and Danielle Mohindra separately reported to Ehret that Lauster had engaged in unprofessional behavior in the operating room that morning. Lozano reported that Lauster had set up the operating room improperly and that he played around with the emergency flashlight during a procedure; more specifically, she said he made hand puppets on the wall with the flashlight. A few minutes later, Danielle reported to Ehret that Lauster had removed the emergency flashlight from the wall, turned it on, and playfully shined the light into a nurse's eyes during a procedure.

After receiving Danielle's report about Lauster misusing the emergency flashlight during a procedure, Ehret directed her to write up a report on the incident. Ehret fired Lauster later that afternoon.

In January 2021 Lauster filed an unfair-practices charge with the NLRB alleging that he was fired for objecting to a nurse running the C-arm. Acting on that charge, the Board's General Counsel issued a complaint accusing Capitol of firing Lauster because of his concerted labor activity—namely, his C-arm comment at the staff meeting—in violation of section 8(a)(1) of the NLRA. Capitol responded that it fired Lauster because of performance problems, not because of his C-arm remark.

An ALJ heard evidence on the complaint over three days in July 2021. The agency's theory of the case was that Lauster had consistently satisfied performance expectations, and that Capitol viewed his objection to nurses running the C-arm as a threat to its money-saving staffing practices. On this view of events, Capitol's justification for firing Lauster—ongoing performance problems, culminating in the flashlight incident— was pretextual; the real reason was his protected labor activity.

To support this theory, the General Counsel presented the testimony of five witnesses: Lauster himself; Ehret; Shepard; Genovese; and IR nurse Leyda Feliu-Corchado, who was present in the IR operating room on November 18, the day Lauster was fired. Shepard's testimony mostly concerned the November 5 staff meeting. Genovese's testimony covered Lauster's positive performance evaluation in December 2019. Feliu-Corchado testified about the flashlight episode; her description departed dramatically from the reports Ehret had received from Lozano and Danielle Mohindra. Feliu-Corchado testified that she had asked Lauster to test the emergency flashlight because it was often broken. When he complied, she asked him to turn it toward her so she could see if

it worked, and he did so. Her testimony matched Lauster's explanation of the event.

Capitol's case in opposition to the charge relied on testimony from lead IR techs Lozano and Mohindra; IR nurse Lori Harbert; Kathleen Hunter, an IR nurse and later director of nursing (she replaced Genovese in that role in February 2020); and Ehret. These witnesses told a very different story. They testified that Lauster had persistent performance problems, including inattentiveness, inability to maintain focus, and occasional unprofessional conduct. More specifically, they testified that Lauster failed to consistently pay attention during procedures, which sometimes required Dr. Mohindra to repeat instructions. They said he was easily distracted and chatted too much. They said he sometimes dropped things and occasionally played around with medical equipment or doodled on equipment trays with markers or saline solution, among other immature behaviors. As for the flashlight incident, Lozano and Mohindra repeated what they said in their reports to Ehret.

Ehret testified that he spoke with Lauster about the ongoing performance issues, to little effect. He said the November 18 report about flashlight misuse was simply the "straw that broke the camel's back." Ehret also testified that when he made the discharge decision that day, he was unaware of Lauster's comment about the C-arm issue at the November 5 staff meeting. Danielle Mohindra corroborated this account: she testified that although she gave Ehret a short verbal summary of what occurred at the meeting, she did not tell him about Lauster's C-arm comment.

In a procedural twist, the ALJ who heard the evidence left the agency before issuing a decision. Another ALJ took over,

and the parties agreed that he could decide the case based on the existing paper record. The new ALJ largely discredited the testimony of Capitol's witnesses and determined that the clinic's justification for firing Lauster—the performance concerns we've described above—was pretextual. The ALJ found instead that Capitol fired Lauster because of his protected activity in violation of section 8(a)(1). The ALJ issued a make-whole award, including monetary compensation and a requirement that Capitol offer to reinstate Lauster.

Capitol sought administrative review. The Board adopted the ALJ's findings and conclusions and affirmed the award with modifications not relevant here. Capitol then filed a petition for judicial review, and the Board cross-appealed for an order enforcing the award.

## II. Discussion

### A. Standard of Review

Our review of the Board's decision is deferential: we assess "whether substantial evidence supports the Board's factual findings and whether legal conclusions have a reasonable basis in law." *Constellation Brands U.S. Operations, Inc. v. NLRB*, 992 F.3d 642, 646 (7th Cir. 2021); *see also* 29 U.S.C. § 160(e). The substantial-evidence inquiry asks only whether the record contains evidence in support of the outcome that would "satisfy a reasonable fact finder." *Mondelez Global LLC v. NLRB*, 5 F.4th 759, 769 (7th Cir. 2021) (internal quotation marks omitted). Under this standard, the ALJ's credibility determinations receive special deference. *Id.* Finally, when "the Board adopts the ALJ's findings of fact and conclusions of law, our review focuses on the ALJ's order." *Constellation Brands*, 992 F.3d at 646. Here the Board adopted the ALJ's

findings and conclusions with only immaterial modifications
to the remedial order. Our analysis thus focuses on the ALJ's
order.

As a threshold matter, Capitol urges us to review the ALJ's
factual findings de novo because of a procedural quirk in the
case: the ALJ who decided the case did not preside at the evi-
dentiary hearing and thus made credibility determinations
based on the paper record. That procedural oddity doesn't
displace the substantial-evidence standard, but it does alter
the special deference ordinarily owed to credibility findings.
We've explained that an ALJ's credibility findings receive
great weight when they "rest explicitly on an evaluation of the
demeanor of the witnesses." *NLRB v. Cutting, Inc.*, 701 F.2d
659, 663 (7th Cir. 1983). But the extra thumb on the scale isn't
justified when credibility determinations do not involve judg-
ments about witness demeanor. Because the credibility find-
ings in this case do not rest on the demeanor of the witnesses,
the heightened measure of deference does not apply. But the
substantial-evidence standard of review remains applicable.
*Id.*

Our standard of review takes account of "the entire rec-
ord, including the evidence opposed to the Board's view from
which conflicting inferences reasonably could be drawn." *Am.
Diversified Foods, Inc. v. NLRB*, 640 F.2d 893, 895 (7th Cir. 1981)
(citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88
(1951)). The ALJ's obligation to consider the entire record
"does not require a complete written evaluation of every piece
of testimony and evidence." *Advoc. S. Suburban Hosp. v. NLRB*,
468 F.3d 1038, 1044 (7th Cir. 2006) (internal quotation marks
omitted). Rather, the facts and the law together must "build
an accurate and logical bridge between the evidence and the

result." *Id.* (internal quotation marks omitted). The "failure to address important evidence can sometimes cause a decision's logical bridge to collapse." *Id.* (internal quotation marks omitted).

## B. Merits

Section 7 of the NLRA protects the right of employees "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, *and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection … .*" 29 U.S.C. § 157 (emphasis added). As relevant here, section 8(a)(1) provides that an employer's interference with an employee's exercise of section 7 rights is an unfair labor practice. *Id.* § 158(a)(1).

To prove a violation of section 8(a)(1), the NLRB's General Counsel must show that an employer took an adverse employment action against an employee because of his protected activity; this, in turn, requires proof that the employee's protected conduct was a substantial or motivating factor in the employer's adverse-action decision. *Vulcan Basement Waterproofing of Ill., Inc. v. NLRB*, 219 F.3d 677, 684 (7th Cir. 2000).

Section 8 violations are normally analyzed under the burden-shifting method established in *Wright Line, Inc.*, 251 N.L.R.B. 1083 (1980). *See NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 404 (1983) (approving the *Wright Line* framework), *abrogated on other grounds by Dir., Off. of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267 (1994). To establish a prima facie case under the *Wright Line* framework, the General Counsel must prove three elements: (1) the employee engaged in a protected activity; (2) the employer's

decisionmaker knew of the employee's protected activity; and (3) the decisionmaker took adverse action against the employee because of animus or hostility toward his protected activity. *Mondelez Global*, 5 F.4th at 769. If the General Counsel makes this prima facie showing, then the burden shifts to the employer to establish that "it would have discharged the employee even 'in the absence of the protected conduct.'" *Id.* (quoting *Wright Line*, 251 N.L.R.B. at 1089).

The parties agree that Lauster's objection at the November 5 staff meeting to a nurse running the C-arm qualifies as protected activity under section 7. The dispute centers on the elements of knowledge and causal animus.

To prove the knowledge element, the General Counsel must establish that the employer's decisionmaker was aware of the employee's protected activity when the adverse decision was made. *Vulcan Basement*, 219 F.3d at 685. This case therefore turns on whether Ehret, Capitol's decisionmaker, knew about Lauster's C-arm comment when he made the decision to fire him, and secondarily, whether that decision was motivated by animus or hostility toward the protected activity. In this context, as elsewhere, the state-of-mind elements of knowledge and animus can be proved by direct or circumstantial evidence. *Mondelez Global*, 5 F.4th at 770.

We note for starters that the parties vigorously debate whether substantial evidence supports the ALJ's finding that Capitol's performance-based justifications for firing Lauster were pretextual. It's not necessary to resolve this question. As we explain in a moment, the ALJ's finding on the knowledge element lacks adequate evidentiary support, so there's no need to reach the issue of pretext.

Ehret testified without contradiction that he was unaware of Lauster's C-arm comment at the November 5 meeting when he made the decision to fire him two weeks later. Ehret was not present at the meeting, and he testified that no one told him about Lauster's C-arm comment afterward or at any time before he made the discharge decision. Although he received a short summary of the meeting from Danielle Mohindra soon after it concluded, he testified that she did not mention anything about Lauster's objection to a nurse running the C-arm. Danielle corroborated his testimony, confirming that she did not tell Ehret about Lauster's C-arm remark when she briefed him about the meeting afterward. Lozano, too, testified that she never told Ehret about Lauster's C-arm comment.

The ALJ was skeptical of all this, finding it "implausible that such an important and controversial issue, including the comments of Dr. Mohindra about permitting overtime for IR Techs, would not have been reported to Ehret, especially since he was the one who put the issue on the agenda for the meeting." And on that basis, the ALJ discredited Ehret's testimony on this point—and Mohindra's and Lozano's—and found that he knew about Lauster's C-arm comment when he fired him.

The substantial-evidence standard is not demanding, but we agree with Capitol that the ALJ's knowledge finding lacks evidentiary support. Ehret's testimony that he did not know about Lauster's comment was corroborated by Mohindra and Lozano and unrebutted by other evidence; the General Counsel presented no direct or circumstantial evidence

undermining their consistent testimony on this point.[1] The ALJ's contrary finding is not a reasonable inference drawn from evidence in the record bearing on the knowledge question. Rather, the ALJ speculated that *someone*—likely Danielle Mohindra or Lozano—*must have* told Ehret about Lauster's comment because he added the issue to the meeting agenda. That is not an evidence-based factual finding; it is conjecture.[2]

It's undisputed that the C-arm discussion took only five minutes of a 90-minute meeting that included several other topics, most of which related to inventory-control concerns. Dr. Mohindra was the most prominent and outspoken participant in the C-arm discussion (among other topics). Indeed, Shepard titled her recording the "Mohindra Rant." And tellingly, during the brief discussion of the C-arm issue, it was Rollins—not Lauster—who observed that using an unlicensed nurse to operate the C-arm is "prosecutable." In contrast, Lauster's contribution to the discussion was quite brief: in response to Dr. Mohindra's question about whether Chelsy Perry could operate the C-arm, he replied, "No. … She's an RN." That's the extent of his participation. It's not inherently implausible that Danielle Mohindra would omit reference to

---

[1] The ALJ said the three witnesses—Ehret, Danielle Mohindra, and Lozano—testified inconsistently on this issue. The record does not bear that out. Though their testimony did not line up in several other respects, on this point all three were consistent.

[2] It does not matter that the employee's supervisor was aware of the protected activity if the supervisor was not involved in the adverse employment decision. *Vulcan Basement*, 219 F.3d at 685–86. We held in *Vulcan* that imputing a supervisor's knowledge to the company "improperly removes the General Counsel's burden of proving knowledge." *Id.* at 685.

Lauster and focus on the other topics at the meeting and the more active participants in the C-arm discussion—especially Dr. Mohindra—when she summarized the meeting for Ehret.

Moreover, no evidence suggests that either Danielle Mohindra or Lozano exhibited hostility toward either Lauster or his views about who may run the C-arm. On the contrary, Lauster testified that he enjoyed cordial, even friendly, relationships with them. This undercuts the ALJ's speculation that one of them surely must have relayed Lauster's C-arm comment to Ehret. *Cf. Vulcan Basement*, 219 F.3d at 685–87 & 685 n.7 (citing *GATX Logistics, Inc.*, 323 N.L.R.B. 328 (1997)) (explaining that it is less reasonable to infer that a supervisor informed the decision-maker about an employee's protected union activity when the supervisor is prounion than when he has demonstrated antiunion animus).

As we've noted, the lion's share of the ALJ's analysis focused on whether Capitol's performance-based reasons for firing Lauster were pretextual. The question of pretext may overlap with the third element of the *Wright Line* framework, which requires proof that the employer acted because of animus or hostility toward the employee's protected activity. But pretext considerations cannot satisfy the General Counsel's burden to prove that the decisionmaker was aware of the employee's protected conduct. "An employer is not required to give reasons when it fires its employees." *Vulcan Basement*, 219 F.3d at 688. Capitol was free to fire Lauster for a good reason, a bad reason, or no reason at all; under the NLRA, it was only prohibited from doing so because of his protected activity. *Id.* Without evidence, direct or circumstantial, that Ehret knew of Lauster's protected activity, the agency's case fails at step two of the *Wright Line* framework.

Substantial evidence does not support the ALJ's finding that Ehret knew of Lauster's C-arm comment when he made the decision to fire him. It follows that the ALJ's finding of causal animus is also infirm. Without evidence that Ehret knew of Lauster's protected activity, there is no basis to find that he fired him because of animus toward that protected activity. The logical bridge collapses. We therefore GRANT the petition for review, VACATE the NLRB's decision and order, and DENY the petition for enforcement.